IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MARK JOSEPH SHIPP, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:21cv00414 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WARDEN PUNTURI, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) |          United States District Judge |
| Defendants. | ) | |

Mark Joseph Shipp, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983, alleging that defendants subjected him to excessive force, were deliberately indifferent to that alleged excessive force, and/or were deliberately indifferent to his attendant medical needs. The defendants filed a motion for summary judgment, arguing that Shipp failed to exhaust his bystander liability claims. Having reviewed the record, the court will deny the defendants' motion.

**I.**

Shipp alleges that on March 29, 2021, while at Pocahontas State Correctional Center ("Pocahontas"), defendant Lt. Bogle "assaulted [him] by slamming [his] face against the wall while [he] was already completely restrained," causing a black eye, swelling around his eye, and "damage[ed] vision." (Am. Compl. at 4 [ECF No. 15].)

Prior to the alleged assault, Shipp claims that he and another inmate were called into the counselor's office about a "minor 'horseplay' incident." (*Id.*) Shipp states that they both "took full responsibility," explained to defendant Captain Neal that they are "good friends," and "apologized repeatedly for causing any confusion." (*Id.*) Afterward, the other inmate was

escorted from the office. While he was further discussing the incident with Captain Neal, Shipp alleges that he was "placed in handcuffs behind [his] back, shackles on [his] ankles, and [he] was being held by [two] officers," defendant Officer Scott on his left arm, and defendant Officer Craig on his right arm. (*Id.*) Shipp adds that he "was not resisting whatsoever," and that the handcuffs and shackles were placed on him as a matter of policy when any inmate is taken to the restrictive housing unit ("RHU")/segregation. (*Id.*) Despite being restrained in this manner, Shipp asserts that Lt. Bogle "came from behind," grabbed the back of his head, and slammed his face into the wall. (*Id.*) Shipp claims that his face "bounced off the wall" and Bogle "forced" his head and face against the wall, holding it there with continued force for approximately 30 seconds. (*Id.* at 5.) Shipp reiterates that he was "not resisting, or violent, or combative, or yelling, or non-compliant in any way." (*Id.*)

Shipp was then transferred to the RHU. Despite this use-of-force incident and his apparent injuries, Shipp asserts that he was not seen by medical staff and no photographs were taken. Shipp claims that Captain Neal and Unit Manager ("UM") Hammond reviewed the camera footage of the "horseplay" incident with the other inmate and determined that they were "clearly not fighting"; and Shipp was released from the RHU two hours after his initial placement there. (*Id.*)

Shipp contends that after "many requests" by his family, the institutional attorney, and himself, pictures were taken of his eye on April 8, 2021, 11 days after the alleged attack, and he was finally assessed by medical staff on April 12, 2021, 15 days afterwards. (*Id.*) As a result of this incident, Shipp claims to have suffered serious vision impairment and chronic headaches. (*Id.* at 6–7.) He claims that an eye doctor told him that he would have the "floaters"

in his vision "for years" and they would "most likely be permanent." (*Id.* at 6.) The eye doctor also prescribed eyeglasses for the "vision impairment" in Shipp's left eye. (*Id.*)

Shipp alleges that Lt. Bogle used excessive force against him, and the defendants concede that he administratively exhausted this claim as to this defendant. But insofar as Shipp asserts a claim for bystander liability against Captain Neal, Officers Craig and Scott, and UM Hammond for failing to prevent and/or intervene in this alleged unconstitutional assault by Lt. Bogle, these defendants contend that he failed to exhaust his administrative remedies, and therefore, that they are entitled to summary judgment on that claim.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-

moving party may not rely on conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315−16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

## III.

The defendants argue that Shipp failed to exhaust available administrative remedies as to his bystander liability claims, as required by 42 U.S.C. § 1997e(a).[1] The court disagrees and, therefore, will deny the defendants' motion.

### A.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). A prisoner must exhaust

---

[1] The defendants concede that Shipp exhausted his excessive force claim and do not address the exhaustion of any other claim.

all available administrative remedies, whether or not they meet federal standards or are plain, speedy, or effective, and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005).

Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 & 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he second PLRA amendment made clear that exhaustion is now mandatory."). An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

## B.

In support of the defendants' motion for summary judgment, Grievance Coordinator C. Smalling provided: an affidavit; the applicable version of the Virginia Department of Corrections' ("VDOC") Offender Grievance Procedure, Operating Procedure ("OP") 866.1; and Shipp's relevant grievance records. (*See* ECF No. 44-1.) OP 866.1 details the grievance process by which offenders must resolve complaints, appeal administrative decisions, and challenge the substance of procedures. Grievance Coordinator Smalling explains that the

grievance process provides corrections staff a means to evaluate potential problem areas and, if necessary, correct those problems in a timely manner. There is no dispute that Shipp's bystander liability claims are subject to the well-established requirements of OP 866.1. All inmates are oriented to the grievance process when they arrive at a facility.

Prior to submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to resolve his complaint informally. According to OP 866.1, the first stage of the informal complaint procedure is for the inmate to communicate his concerns to staff verbally. If the issue is not resolved—or if the inmate is not satisfied with the resolution—he generally must document his good-faith effort using an informal written complaint form. When a written complaint is received, it is logged in VACORIS, the VDOC's computer-based offender information management system, and a receipt is issued to the inmate. Within 15 days of receipt of the written complaint, staff should respond to the informal complaint. If an inmate is not satisfied with the staff's response to the informal complaint, he may file a regular grievance. If no response is given to the inmate within 15 days of the logging of the informal complaint form, the inmate may file a regular grievance, and he must attach the receipt of the informal complaint form to the grievance as documentation of his attempt to resolve the issue informally. The inmate is responsible for submitting the informal complaint in a timely manner to allow time for staff to respond within the time period allowed to file a regular grievance.

A regular grievance generally must be delivered to the grievance mailbox at the institution where the inmate is housed within 30 days from the date of the incident or discovery of the incident. Regular grievances are date-stamped on the working day they are received. If the grievance meets the criteria for acceptance, it is logged in VACORIS and

receipt is issued to the inmate within two working days from the date the grievance is received. If the grievance does not meet the criteria for acceptance, the grievance is returned to the inmate within two working days of its receipt, along with an explanation for why the grievance was rejected at intake. Staff retain copies of all returned grievances. Intake rejections can be appealed to the Regional Ombudsman within five days. The Regional Ombudsman's review of the intake decision is the final level of review.

If a grievance is accepted at intake, it may proceed through up to three levels of review. Grievances must be appealed through all available levels of review to satisfy the requirement of exhaustion before filing a § 1983 lawsuit. Level I reviews are conducted by Warden or Superintendent. If the inmate is dissatisfied with the determination, he may appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services, or Superintendent for Education. For most issues, Level II is the final level of review. For those issues appealable to Level III, the Deputy Director or Director of the VDOC conducts a review of the regular grievance. The time limit for issuing a Level I response is 30 days, 20 days for a Level II response, and 20 days for a Level III response. Expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal.

## C.

According to Grievance Coordinator Smalling, a review of Shipp's grievance file indicates that Shipp did exhaust his allegation that Lt. Bogle assaulted him on March 29, 2021. But Grievance Coordinator Smalling contends that Shipp did not exhaust his claims that

defendants Captain Neal, Officers Craig and Scott, and UM Hammond are liable for the assault under a theory of bystander liability.[2] Having reviewed the record, the court disagrees.

On April 15, 2021, Shipp filed an informal written complaint, alleging that on March 31, 2021, he had turned in a written complaint about being assaulted by Lt. Bogle, but he had not received a receipt or a response.[3] (*See* ECF No. 44-1 at 23.) Shipp also stated that he had sent two request forms, on April 7 and 9, 2021, inquiring as to the status of his written complaint and advising the grievance coordinator that he had never received a receipt or response. On April 19, 2021, a major responded to Shipp's written complaint, stating he had spoken to Shipp on April 15, 2021, and Shipp had advised the major that his family would deal with the issue. The response also indicated that pictures were taken the day of the incident and that Shipp had been released from the RHU 35 minutes after his placement there.

On April 20, 2021, Shipp filed a regular grievance. (*See* ECF No. 44-1 at 27.) In his regular grievance, Shipp stated that Lt. Bogle used excessive force against him on March 29, 2021, by "slamming [his] face off the wall" while he was "talking to Captain Neal" and "two

---

[2] The defendants also construe Shipp's allegations as asserting a bystander liability claim against Warden Punturi (*see* Mem. Supp. Summ. J. 1 [ECF No. 44]), but the court does not read Shipp's amended complaint to allege such a claim. Shipp does not allege that Warden Puntuti was present at the time of the alleged attack or that he had any reason to anticipate it. Shipp asserts that Warden Punturi was deliberately indifferent to the assault and the subsequent delay of medical care, but he also claims that Punturi is "legally responsible for the overall operations of the institution . . . and the welfare of all the inmates in that prison." (Am. Compl. 2 [ECF No. 15].) As such, it appears to the court that Shipp is alleging that Warden Punturi is responsible for the constitutional violations against Shipp under a theory of supervisory liability. The court makes no judgment as to the viability of a supervisory liability claim in this opinion.

[3] Shipp also filed a second informal written complaint on April 15, 2021, alleging the assault by Lt. Bogle and stating that two officers were restraining him at the time of the attack. (*See* ECF No. 44-1 at 28.) An April 30, 2021 response to the complaint indicated that the issue had been "investigated" and there was "no evidence to support whether this incident occurred or did not occur." (*Id.*) Because the response to this written complaint was given after Shipp filed his regular grievance, it appears the grievance process proceeded based on the other written complaint filed the same day.

officers were holding each of [his] arms." (*Id.*) He also states that pictures were not taken of his injuries until 11 days after the incident and he did not receive medical care until two weeks after the incident. Shipp specifically identifies defendants Captain Neal, Officers Scott and Craig, and UM Hammond as being present during the incident.[4] On May 7, 2021, the Warden responded and stated that the incident had been investigated and there was "no evidence to support whether this incident occurred or did not occur." (ECF No. 44-1 at 26.) The warden concluded there was "no indication that Lt. Bogle conducted himself outside of procedural guidelines or that [Shipp was] injured by staff" and, therefore, with no policy or procedural violations, Shipp's grievance was unfounded. (*Id.*)

The next day, on May 8, 2021, Shipp appealed the grievance response and reiterated that he was attacked from behind while he was handcuffed, shackled, and being held by two officers. (*See* ECF No. 44-1 at 25.) Shipp stated that there were five other staff in the room during the incident. Shipp's level II appeal was determined to be unsubstantiated on June 2, 2021. Shipp filed his § 1983 complaint in this action on July 14, 2021. (*See* ECF No. 1 at 9.)

### D.

The defendants argue that "at no point in [Shipp's] use of the grievance procedure regarding the alleged March 29, 2021 incident, did [Shipp] alert VDOC officials that he believed the other officials present during the alleged wall-slamming incident violated his rights by not intervening on his behalf." (Mem. Supp. Summ. J. 11 [ECF No. 44].) The court disagrees.

---

[4] He also names a fifth, non-defendant staff member who was present.

"[T]o satisfy the exhaustion requirement, grievances generally need only be sufficient to 'alert[] the prison to the nature of the wrong for which redress is sought.'" *Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). "Thus, once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Id.* "A grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved. *Wright v. Perritt*, 2020 U.S. Dist. LEXIS 242349, *5 (citing *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009). "A grievance also need not contain every fact necessary to prove each element of an eventual legal claim. The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation." *Id.*

"[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203, 204 (4th Cir. 2002). Shipp asserted in his regular grievance that defendants Captain Neal, Officers Scott and Craig, and UM Hammond were all present during the incident. He further alleges that he was speaking with Captain Neal and the two officers were holding his arms while Lt. Bogle attacked him from behind. *If* the attack happened as Shipp describes in his grievance and the four defendants were, in fact, present to witness it, they should have known that Lt. Bogle was violating Shipp's constitutional right to be free from excessive force. That Shipp apparently suffered injuries from the attack would suggest that the defendants failed to intervene during the attack. Whether they had a reasonable

opportunity to prevent the harm and chose not to act, however, is not as clear. But Shipp does not need to allege the elements of a legal claim in his administrative grievances. Because Shipp's grievance plainly described that he was violently attacked by an officer from behind while he was being restrained by two other officers, and in the immediate presence of others, it was more than sufficient to put the defendants (and the prison) on notice of potential bystander liability claims. Accordingly, the court concludes that Shipp did sufficiently exhaust his administrative remedies.[5]

## IV.

For the reasons stated, the court will deny the defendants' motion for summary judgment and this matter will proceed to trial on December 18–20, 2023, as currently scheduled.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 30th of October, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[5] The court notes that the defendants filed this motion for summary judgment more than a year after the court initially ordered that any motion for summary judgment be filed. On April 21, 2022, the court ordered the defendants to file any motion for summary judgment within 60 days and stated that if no motion was filed, this matter would be set for a jury trial. (ECF No. 24.) On June 21, 2022, the defendants filed a motion for an extension of time to file, and the court granted that motion, giving the defendants until September 10, 2022 to file any motion. (ECF Nos. 26 & 27.) The defendants filed no motion. In November 2022, counsel entered the case on Shipp's behalf. (ECF Nos. 31–33.) On January 13, 2023, the matter was set for a jury trial in the Abingdon Division on December 18–20, 2023. In March 2023, a pretrial scheduling order was entered, and still, defendants filed no motion for summary judgment. (ECF No. 36.) Then, on June 15, 2023, the defendants filed a motion seeking leave to file a motion for summary judgment. (ECF No. 41.) The magistrate judge granted the motion and gave the defendants seven days to file. (ECF No. 42.) Defendants finally filed a motion for summary judgment on June 22, 2023. (ECF No. 43.)